UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT ADAMS,

        Plaintiff,                      Case No. 16-cv-11764

vs.                                            HON. MARK A. GOLDSMITH

MESTEK MACHINERY, INC.,

        Defendant.

_____/

**OPINION & ORDER
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 19) AND
DENYING PLAINTIFF'S MOTION TO AMEND COMPLAINT (Dkt. 24)**

This matter is before the Court on Defendant Mestek Machinery, Inc.'s motion for summary judgment (Dkt. 19) and Plaintiff Robert Adams's motion to amend complaint (Dkt. 24). The issues have been fully briefed and a hearing was held on September 29, 2017. For the reasons stated below, the Court denies both motions.

## I. BACKGROUND

Plaintiff Robert Adams worked for AutoSteel, a company that specializes in cutting down steel coils for automotive companies, from 1993 until he was injured on the job on October 9, 2014. Pl. Dep., Ex. A to Def. Mot., at 14 (Dkt. 19-1). Adams's primary responsibility while working at AutoSteel was to assist in the operation of the Slear, the machine through which steel coils would be fed and cut down to the requested specifications. Id. at 48. Specifically, Adams was responsible for cleaning the machine's rollers. Id. In order to clean the rollers, Adams had to physically enter the machine two to three times per day. Id. at 83.

Prior to May 2013, AutoSteel used a version of the Slear ("Slear I") that Adams described as "skeleton in form," meaning that the operator of the machine had an unobstructed view of the inside of the machine. Pl. Resp. at 2. According to Adams, this ensured that the operator would

1

know not to begin operating the machine until his coworker had finished cleaning the machine rolls. However, in May 2013, AutoSteel purchased a new Slear machine ("Slear II") from Defendant Mestek Machinery. The Slear II contained two panel doors: a yellow door near the machine's control panel and a blue door near the machine's lower section. Mestek contends that the only proper way to clean the machine's rollers is to enter through the yellow doors. Steve Kreska, Mestek's engineering manager, testified that the yellow door has two purposes: "gaining access to the interior machine for maintenance purposes, and . . . to gain access to the interior of the machine for setting up the . . . slitter knives." Kreska Dep, Ex. 1 to Def. Mot., at 39 (Dkt. 19-2). Significantly, Kreska testified that the yellow door "is meant to be the only egress for an operator to go in and out of the machine." Id. at 40. The yellow door is also equipped with an interlock device, which shuts off power to the machine when the door is open.

Adams contends that the blue doors "made it eminently easier to access the roller than entry into the machine through the yellow door." Pl. Resp. at 5. Adams contends that the yellow door leads to an area within the machine that, pursuant to OSHA standards, would be defined as a "confined space." Adams describes the area as "unlit and cramped." Id. at 2. Further, Adams's expert, Robert Burnham, stated that "[t]he use of this [yellow] door would also require the maintenance person to pass under the slitter blades when coming from this direction." Burnham Report, Ex. 7 to Pl. Resp., at 4 (Dkt. 27-10).

On October 9, 2014, Adams and his supervisor, Frank Pearson, were attending to the Slear II machine. After they returned from lunch, Pearson turned off the machine so Adams could enter the machine in order to clean the rollers. Adams Dep. at 89. Adams entered the machine through the blue doors and began to clean. Id. Unlike the hundreds of other times that Adams and Pearson worked on the machine together, Pearson failed to inform Adams that he was starting the machine up again. Id. at 90. When the machine began running, Adams's hand became caught in the rollers.

Id. This ultimately caused the loss of two of Adam's fingers and the use of his dominant right hand.

Adams brought the instant suit, alleging that Mestek defectively designed and manufactured the Slear II. Mestek contends that Adams's entry through the blue door, as opposed to the yellow door, constituted misuse of its machine. Mestek notes that, unlike the blue door, the yellow door is equipped with an interlock device, which prevents the machine from being operated while the door is open. The blue door contains no such safeguard. Mestek also argues that the alleged misuse — entry through the blue door — was not foreseeable. It notes that the blue door was bolted onto the machine, so that users could not access the machine through that door. Adams (or another employee of AutoSteel) unscrewed the bolt sometime after installation in order to gain access to the machine. The blue door also contained a sticker which stated as follows: "Warning, door must be closed while machine is running." Adams Dep. at 76. Mestek's safety manual also required the use of a "lock out, tag out" device when anyone was operating the Slear II. This device locks off power to the machine, so that only the key used to lock the machine can turn it back on. This is meant to prevent operation of the machine while an individual is conducting maintenance.

Mestek now moves for summary judgment, arguing that Adams misused the product in a way that was not reasonably foreseeable. Adams moves to amend to assert additional claims for negligent production, breach of express and implied warranties, gross negligence, and failure to warn.

## II. STANDARD OF REVIEW

A court must grant "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making this determination, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." U.S. S.E.C. v.

Sierra Brokerage Servs., Inc., 712 F.3d 321, 327 (6th Cir. 2013). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986). "[W]hen a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" Id. at 250 (quoting Fed. R. Civ. P. 56(e)). Furthermore, plaintiff "cannot rely on conjecture or conclusory accusations." Arendale v. City of Memphis, 519 F.3d 587, 605 (6th Cir. 2008).

## III. ANALYSIS

Mestek argues that it is entitled to summary judgment because Adams misused the Slear II when he entered the machine through the blue panel door, instead of the yellow door. "In Michigan, misuse of a product is an absolute defense for a manufacturer or a seller in a product liability action if the misuse was not reasonably foreseeable to the defendant." Johnson v. Serv. Tool Co., LLC, No. 2:14-CV-12438, 2015 WL 7760480, at *6 (E.D. Mich. Nov. 30, 2015). This principle is codified in the Michigan Product Liability Act, which states "[a] manufacturer or seller is not liable in a product liability action for harm caused by misuse of a product unless the misuse was reasonably foreseeable." Mich. Comp. Laws Ann. § 600.2947(2). The statute states that whether there was misuse and, if so, whether that misuse was reasonably foreseeable, is a legal question to be decided by the Court. Id. The statute defines misuse as follows:

> "Misuse" means use of a product in a materially different manner than the product's intended use. Misuse includes uses inconsistent with the specifications and standards applicable to the product, uses contrary to a warning or instruction provided by the manufacturer, seller, or another person possessing knowledge or training regarding the use or maintenance of the product, and uses other than those for which the product would be considered suitable by a reasonably prudent person in the same or similar circumstances.

Mich. Comp. Laws Ann. § 600.2945(e).

The Court must first determine whether Adams's decision to enter the machine through the blue door, instead of the yellow door, constituted misuse of the Slear II.[1] Adams's use of the machine was materially different than its intended use because it was used inconsistently with the machine's specifications. The machine was designed with a failsafe to avoid the very injury suffered by Adams. The yellow door, which, unlike the blue door, was not bolted down at the time of installation, contained an interlock device. This device would cause the Slear II to shut down entirely when the yellow door was opened; it would be impossible for an operator to restart operations as long as the yellow door was open. Rather than take advantage of this device, Adams (or another AutoSteel employee) chose to unscrew the bolt on the blue door in order to gain access to the machine from a different location. While Adams argues that the blue door provides an easier point of access to the machine's rollers, that door does not contain the crucial interlock feature which ensures the safety of employees conducting maintenance on the machine. Because Adams used the Slear II in a materially different manner than its intended use, he engaged in misuse within the meaning the Michigan Product Liability Act.

But was this misuse reasonably foreseeable? Manufacturers have a duty to design their products "so as to eliminate any unreasonable risk of foreseeable injury." Prentis v. Yale Mfg. Co., 365 N.W.2d 176, 186 (Mich. 1984).

As noted by Adams, the design of the Slear II provided an incentive, despite the risk, to use the blue door. While the blue door was bolted onto the machine, and did not contain an interlock device, it provided an easier and safer route to the rollers. For an employee to reach the

---

[1] In its motion, Mestek alludes to Adams's failure to use a "lock out, tag out" device to power off the machine prior to cleaning. Mestek briefly notes that its safety manual advises customers to make sure the power is locked off prior to servicing the machine. However, because neither party has briefed whether the failure to use the "lock out, tag out" device actually constituted misuse, or whether this misuse was foreseeable, and because Adams disputes that AutoSteel was ever provided with the safety manual, the Court only considers whether use of the blue door constituted foreseeable misuse.

rollers from the yellow door, he would have to travel about eight feet with only eighteen inches of vertical clearance. Burnham Report at 4; Yellow Door Photographs, Ex. 11 to Pl. Resp. (Dkt. 23-14). In addition to traveling through this confined space, the individual would have to avoid slitter blades hanging overhead. While the blue door was not equipped with a failsafe device to prevent injury in the event someone attempted to turn the machine on, entry through the yellow door still posed a risk of injury by forcing an individual to crawl through a confined space in close proximity to slitter blades. Misuse was reasonably foreseeable.

Mestek relies on two cases to argue that Adams's misuse of the Slear II was not reasonably foreseeable. In Cobbs v. Schwing America Inc., No. 04-72136, 2006 WL 334271 (E.D. Mich. Feb. 13, 2006), the plaintiff alleged that the defendant's grout pumps were defective. The plaintiff was assisting his employer in a tunnel boring project under the Detroit River when he was asked to clean the grout pumps. The plaintiff alleged that while his hand was resting on the machine, the grout pump suddenly pulled his hand into the machine through an inlet opening, severing three of his fingers. Relying on expert testimony, the court concluded that the suction from the machine was not strong enough to have pulled the plaintiff's hand into the pump, and that the plaintiff must have stuck his hand twelve inches into the machine while it was operating. In granting the defendant's motion for summary judgment, the court held that "it was not foreseeable that someone cleaning the pump would reach his or her hand into the poppet valve area while it was operating." Id. at *5.

This case is distinguishable from Cobbs. Adams did not begin cleaning the Slear II's rollers while the machine was already running. When he entered the machine and began cleaning, the machine was idle. Adams assumed, based on their past experiences together, that Pearson would wait until Adams had exited the machine to begin operating the Slear II. Adams was only injured when the previously-idle rollers that he was cleaning were activated. Unlike the plaintiff in Cobbs, Adams did not stick his hand into the rollers when they were already in motion.

6

Mestek also analogizes the instant action to Fjolla v. Nacco Materials Handling Group., Inc., No. 281493, 2008 WL 5158892 (Mich. Ct. App. Dec. 9, 2008). In Fjolla, the plaintiff attempted to fix a forklift using a screwdriver. Prior to attempting to fix the forklift, the plaintiff turned off the ignition and activated the parking brake. He then began using the screwdriver on the forklift's control panel. Unbeknownst to the plaintiff, his use of the screw-driver acted to "hot-wire" the forklift, causing the forklift to reverse into the plaintiff. The court held that using a screwdriver to repair a forklift was not a foreseeable misuse, reasoning that the defendants should not have "foreseen that anyone would have attempted to repair an electrical system by employing a screwdriver to separate electrical components, without previously disconnecting the vehicle's battery." Id. at *5.

Fjolla is not analogous to the present case. Adams was not attempting to improperly repair the Slear II. He was attempting to clean the machine's rollers, an action that is required to produce clean auto parts and that the manufacturer anticipated would be done, as evidenced by its inclusion of an interlock device.

Mestek notes that other cases in which misuse was found to be reasonably foreseeable occurred where the misuse was widely known and not addressed. In Belleville v. Rockford Mfg. Grp., Inc., 172 F. Supp. 2d 913 (E.D. Mich. 2001), the plaintiff was killed while setting up a wire draw machine. The court found that the method used by the plaintiff to set up the machine constituted misuse, but that this misuse was reasonably foreseeable. In support of its holding, the court noted that "the way in which Plaintiff was setting up the machine was widely used in the industry." Id. at 918. The court also noted that the defendant failed to include an interlock device that would have prevented the injury suffered by the plaintiff, despite the fact that it included this device on its European models.

In Iliades v. Dieffenbacher North America, 2016 Mich. App. LEXIS 1629, *10 (Mich. Ct. App. July 19, 2016), the plaintiff was injured when he partially entered a press to retrieve a finished

7

part. The presses were equipped with a "light curtain," which essentially served as a sensor that would deactivate the press if the beam of light was interrupted. The plaintiff and other employees were instructed not to rely solely on the light curtain to deactivate the presses; in theory, they were supposed to wait until the press came to a complete stop before retrieving the finished parts. In practice, however, employees were told not to completely shut off machines unless there was a true emergency, and to instead rely on the light curtain in the interest of efficiency. In finding that this misuse of the machine was reasonably foreseeable, the court noted that "defendant was actually aware that clients were bypassing the safety doors that preceded the light curtains in the pursuit of continuing operations." Id. at *10.

These cases notwithstanding, the Michigan Product Liability Act does not require that the manufacturer have actual knowledge of misuse for fault to be found. Rather, the statute states that a manufacturer cannot rely on the absolute defense of misuse where the manufacturer has constructive knowledge of misuse. See Mich. Comp. Laws Ann. § 600.2947(2) (seller is liable if the misuse was "reasonably foreseeable."). The above cases hold that misuse is reasonably foreseeable where such misuse is widely known; they do not hold that this is the exclusive circumstance for a finding of reasonable foreseeability. Indeed, Michigan courts have held that "[f]oreseeability of misuse may be inherent in the product or may be based on evidence that the manufacturer had knowledge of a particular type of misuse." Portelli v. I.R. Const. Prod. Co., 554 N.W.2d 591, 596 (Mich. Ct. App. 1996) (emphasis added). The foreseeability here was inherent in the product. The Slear II contained a blue door that led to a clear path to the machine's rollers; by contrast, entry through the yellow door required an individual to crawl through a confined space just below slitter blades in order to reach the rollers. Because Adams's entry through the blue door was reasonably foreseeable, the Court denies Mestek's motion for summary judgment.

Turning to Adams's motion to amend his complaint, which seeks to add claims of negligent production, breach of express and implied warranties, gross negligence, and failure to warn, the

8

Court recognizes that Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend shall be freely given when justice so requires. However, a court may deny a motion to amend where there is evidence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." Foman v. Davis, 371 U.S. 178, 182 (1962). And "[o]nce the scheduling order's deadline passes, a plaintiff first must show good cause under Rule 16(b) for failure earlier to seek leave to amend before a court will consider whether amendment is proper under Rule 15(a)." Leary v. Daeschner, 349 F.3d 888, 909 (6th Cir. 2003). "[T]he district court also is required to evaluate prejudice to the opponent before modifying the scheduling order." Id.

Adams has not established good cause for missing the Court's deadline to amend by eight months. All of the facts that serve as the basis for the new claims Adams wishes to add were known to Adams at the time he filed his complaint. Adams now claims that he was simply waiting for the outcome of a January facilitation session before amending his complaint. It is unclear how adding new claims by August 5, 2016, the deadline for amending his pleadings, would have affected the outcome of a facilitation that was scheduled for January.

Even if Adams had established good cause, allowing a motion to amend at this late stage would result in prejudice to Mestek. The Sixth Circuit has held that allowing an amendment after the close of discovery creates significant prejudice. See Duggins v. Steak 'N Shake, Inc., 195 F.3d 828, 834 (6th Cir. 1999). In this case, both the discovery and dispositive motions deadlines have passed, with Mestek having already filed its motion for summary judgment. If Adams was permitted to amend his complaint, Mestek would have to defend against newly alleged claims of negligent production, breach of implied warranty, gross negligence, breach of express warranty, and failure to warn, all without the ability to attack the claims by way of a dispositive motion. That prejudice could theoretically be avoided by adjusting the schedule, but then this Court's

efficient administration of its dockets would suffer – a factor that is significant in this analysis. See Robinson v. Michigan Consol. Gas Co., 9 F.3d 109 (6th Cir. 1993).

Given the lack of good cause shown for delay in seeking amendment, and the significant prejudice such an amendment would cause Mestek and/or this Court, the Court denies Adams's motion to amend his complaint.

## IV. CONCLUSION

For the foregoing reasons, the Court denies Mestek's motion for summary judgment (Dkt. 19) and denies Adams's motion to amend complaint (Dkt. 24).

SO ORDERED.

Dated: November 9, 2017  s/Mark A. Goldsmith
Detroit, Michigan  MARK A. GOLDSMITH
 United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 9, 2017.

 s/Karri Sandusky
 Case Manager